IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NEW VISION HOME HEALTH CARE, INC. a
Michigan Corporation, and SALEEM
SHAKOOR, an individual,

Plaintiffs,

v.     Case Number: _____

ANTHEM, INC., an Indiana Corporation,
TRUSTSOLUTIONS, LLC, a Wisconsin
Corporation, and NATIONAL GOVERNMENT
SERVICES, INC., an Indiana Corporation,

Defendants.

_____/

# COMPLAINT

Plaintiffs New Vision Home Health Care and Saleem Shakoor (collectively "New Vision"), by their attorneys, Wachler & Associates, P.C., for their complaint against Defendants TrustSolutions, LLC ("TrustSolutions") and Anthem, Inc. f/k/a WellPoint, Inc. (collectively "Defendants"), state as follows:

## PARTIES AND JURISDICTION

1.     Plaintiff New Vision Home Health Care, Inc. was a Michigan corporation with its principal place of business located at 28475 Greenfield Road, Suite 213 Southfield, Michigan 48076.

2.     Plaintiff Saleem Shakoor resides in the City of West Bloomfield, County of Oakland, Michigan, and at all relevant times was the owner, director, and the sole shareholder of New Vision.

3.      Defendant TrustSolutions, LLC is a foreign corporation incorporated in Wisconsin and has its principal office located at 120 Monument Circle, Indianapolis, Indiana 46204.

4.      Upon information and belief, TrustSolutions, LLC is a wholly owned subsidiary of Defendant Anthem, Inc., f/k/a WellPoint, Inc.

5.      Anthem, Inc. is a foreign corporation incorporated in Indiana with its principal place of business located at 120 Monument Circle, Indianapolis, Indiana 46204.

6.      Upon information and belief, at all relevant times, TrustSolutions was the alter ego of Anthem, Inc., f/k/a WellPoint, Inc., which used TrustSolutions as a mere instrumentality in its abuse of CMS's Program Safeguard Contractor program.

7.      National Government Services, Inc. ("NGS") is a foreign corporation incorporated in Indiana with its principal place of business located at 8115 Knue Road, Indianapolis, IN 46250.

8.      Upon information and belief, NGS is a wholly owned subsidiary of Defendant Anthem, Inc., f/k/a WellPoint, Inc.

9.      Jurisdiction is conferred on this Court by 28 U.S.C. § 1332, by virtue of diversity of citizenship and 28 U.S.C. § 1331, federal question jurisdiction.

10.     Venue is proper in the Eastern District of Michigan, Southern Division because a substantial part of the events giving rise to this action occurred in this Court's judicial district.  28 U.S.C. § 1391..

## **GENERAL ALLEGATIONS**

I.      PLAINTIFFS SALEEM SHAKOOR AND NEW VISION

11.     New Vision was a home health agency and provider of Medicare home health services within the meaning of 42 U.S.C. § 1395x(o), (u).  New Vision furnishes home health services to home-bound patients, among others.

12.     New Vision was a participating provider in Medicare and virtually all of its patients were Medicare beneficiaries. Therefore, New Vision billed Medicare for payment for its services, and relied almost exclusively on reimbursement from Medicare.

II.     NGS

13.     At all relevant times, after rendering services, New Vision submitted claims for Medicare Part A reimbursement to NGS, the Medicare Part A Medicare Administrative Contractor ("MAC") for the State of Michigan.  As a MAC, NGS was responsible for "[d]etermining the amount of payments to be made to providers for covered services furnished to Medicare beneficiaries" and "[m]aking the payments."  42 C.F.R. § 421.100(a).  At all relevant times in this matter, NGS held a contract with CMS pursuant to the Medicare Integrity Program.  42 U.S.C. § 1395ddd.

III.     TRUSTSOLUTIONS AND ANTHEM

14.     At all relevant times, TrustSolutions was a Medicare Program Safeguard Contractor ("PSC") and in this role, contracted with CMS to perform program integrity functions such as detecting and deterring potential waste, fraud and abuse in the Medicare Program. At all relevant times in this matter, TrustSolutions held a contract with CMS pursuant to the Medicare Integrity Program.  42 U.S.C. § 1395ddd.

15.     Upon information and belief, Anthem is the largest for-profit managed health care company in the Blue Cross and Blue Shield Association. It acquired WellPoint Health Networks, Inc., with the combined company adopting the name WellPoint, Inc. on November 30, 2004, and effective December 2, 2014, WellPoint changed its corporate name to Anthem, Inc.

16.     Upon information and belief, at all relevant times Anthem promulgated and advanced a corporate policy of using its PSC subsidiaries to audit New Vision in violation of

Medicare policies and procedures, with the intent of maximizing overpayments as a means of maintaining or gaining additional contracts with Medicare, including contracts as CMS Recovery Audit Contractors ("RAC") and Zone Program Integrity Contractors (ZPICs), of which RACs are entitled to contingent compensation on their determinations of Medicare overpayments.

17.     Upon information and belief, during the time period in which New Vision's claims arise, Anthem used TrustSolutions for its own benefit as a mere instrumentality to accomplish this policy and, in so doing, failed to observe corporate formalities such that there was no distinction between the two entities in Anthem's control over TrustSolutions' execution of its day-to-day operations.   Rather, upon information and belief, Anthem exercised direct control over the management, directors, and officers of TrustSolutions to advance its policy.

18.     As such, upon information and belief, TrustSolutions functioned as the alter ego of Anthem for purposes of pursuing Anthem's unlawful objectives through the PSC program.

IV.     PREPAYMENT REVIEW

19.     In or about early December 2006, TrustSolutions initiated a pre-payment review of home health claims submitted by New Vision to NGS.   Prepayment review is a process by which Medicare contractors review claims prior to payment. Prepayment review results in an initial determination which can be appealed through the Medicare appeals process. Under Medicare, PSCs conduct both pre- and post-payment reviews. (Medicare Program Integrity Manual, Pub. 100-8, Chpt. 3, § 3.2).

20.     In response to TrustSolutions' prepayment review whereby it requested claim documentation on each Medicare claim billed by New Vision, during the course of the prepayment review New Vision submitted, among other things, 485 care plans and clinical notes.

21.     After reviewing the information submitted by New Vision, TrustSolutions denied

4

the overwhelming majority of the claims under prepayment review. TrustSolutions notified NGS of its determinations and NGS issued remittance notices to New Vision denying payment for the denied claims.

22. The pre-payment review continued for some time, with NGS issuing remittance notices denying payment on the vast majority of claims at TrustSolutions's direction.

23. New Vision timely appealed the denied claims through the Medicare Appeals Process and following determinations by administrative law judges ("ALJs") in or about October 2007 through November 2008, New Vision ultimately succeeded in obtaining favorable findings on the claim denials for approximately 97% to 98% of the prepayment review denied claims.

24. Upon information and belief, NGS received copies of the favorable ALJ determinations and accordingly, beginning in or about October 2007 through November 2008 NGS was aware of the nearly wholly favorable findings on the prepayment review matters. 42 C.F.R. § 405.1046

25. TrustSolutions terminated the pre-payment review on or about January 9, 2008.

V.     POSTPAYMENT AUDIT

26. On or about July 31, 2007, TrustSolutions issued a letter to New Vision initiating a post-payment review and request for medical records, which, upon information and belief, concerned claims reimbursed from January 1, 2004 to December 10, 2006 related to services New Vision provided to 186 Medicare beneficiaries regarding 228 episodes of home health care from May 8, 2003 through October 3, 2006 (*See* pgs. 2-3 and 271-273 of September 4, 2013 Administrative Law Judge ("ALJ") Decision by U.S. ALJ James S. O'Leary at **Exhibit A**).[1]

---

[1] The September 4, 2013 ALJ Decision is attached hereto in redacted form so as to protect the protected health

27.     The post-payment review was not warranted by the findings of the pre-payment review, which had been concluded with nearly 100% favorable findings by ALJs in favor of New Vision in 2007 and 2008.  As discussed in further detail below, the post-payment review was conducted in violation of federal law and CMS policy and deprived New Vision of its substantive and procedural due process rights.

28.     TrustSolutions' July 31, 2007 letter wrongfully did not indicate that the postpayment review would involve statistical sampling and did not identify the universe of claims subject to the postpayment review. (*Id.* at pg. 2). Additionally, the July 31, 2007 letter wrongfully did not cite a sustained or high level of payment error or a pattern of overutilization of therapy services or any other reason for conducting a statistically extrapolated postpayment audit. (*Id.* at pg. 19). *See* 42 U.S.C. § 1395ddd(f)(3) and (7); Medicare Program Integrity Manual, Pub. 100-8, Chpt. 3, § 3.10.6.1.1.

29.     In or about September 2007 New Vision submitted to TrustSolutions the information and documentation TrustSolutions had requested regarding the 228 episodes of care.

30.     On or about August 14, 2008, TrustSolutions affirmed the initial coverage and payment determinations on 27 of 228 episodes of care and denied the remaining episodes claiming that the services did not satisfy the Medicare medical necessity criteria, coverage criteria or documentation requirements for Medicare payment. (*Id.* at pg. 3). As a result of its medical reviews, TrustSolutions determined that New Vision had received and retained a total of $672,493.57 in actual overpayments based upon the 221 episodes of care denied in the sample. TrustSolutions then relied upon that amount to calculate, by statistical extrapolation, a total

---

information of Medicare beneficiaries. The redacted information is not germane to the instant dispute, but Plaintiff anticipates that it will file a full, unredacted copy under seal or protective order at a future date if necessary.

overpayment amount for all of the claims in the universe, and determined that New Vision had been overpaid an amount of $4,155,239.00.  (*Id.* at pg. 4).

31.    New Vision was not advised of the results of the postpayment audit until on or about December 30, 2009, the date on which TrustSolutions reported the postpayment audit findings in a letter addressed to New Vision. (*Id.*)

VI.    NGS'    POSTPAYMENT    OVERPAYMENT    DEMAND    AND REDETERMINATION

32.    In a letter dated December 31, 2009, NGS demanded that New Vision repay the purported $4,155,239.00 overpayment ("Overpayment Demand Letter") (*Id.* at pg. 5).

33.    New Vision was entitled to appeal the overpayment demand under a five-step appeals process, which includes (a) redetermination, (b) reconsideration, (c) ALJ hearing, (d) Medicare Appeals Council review, and (e) appeal to the Federal District Court. *See* 42 U.S.C. § 1395ff and 42 C.F.R. §§ 405.900 to 405.1140.

34.    In and prior to December 2009, neither TrustSolutions nor NGS provided New Vision with any information regarding TrustSolutions' statistical sampling and extrapolation methodologies or calculations.  Accordingly, New Vision could not challenge the statistical extrapolation of the overpayment findings at the first redetermination level of appeal. New Vision's inability to review and challenge the statistical extrapolation of the overpayment findings at redetermination meant that  TrustSolution's  erroneous and unlawful extrapolated overpayment findings  proceeded unchallenged to the second level of the Medicare appeals process (reconsideration).  *See* 42 U.S.C. § 1395ddd(f)(7), 42 CFR 405.956(b)(2) and Medicare Program Integrity Manual, Pub. 100-8, Chpt. 3, § 3.10.

35.    On or about January 24, 2010 New Vision timely filed an administrative appeal

with NGS of NGS' overpayment determination ("Redetermination Appeal"). (*Id.* ) As of the date New Vision filed its Redetermination Appeal, it still did not have the information and documentation TrustSolutions relied upon, created and utilized in extrapolating the audit findings to the total $4,155,239.00 overpayment demand. Accordingly, on March 2, 2010 and on August 11, 2010 New Vision submitted Freedom of Information Act ("FOIA") Requests to TrustSolutions to obtain information regarding the statistical projection. (*Id.*)

36.     On or about March 17, 2010 NGS upheld nearly all of TrustSolution's initial determinations. Specifically, NGS issued a "partially favorable" redetermination decision, affirming all of TrustSolution's denials and corresponding overpayments except as to three beneficiaries out of one hundred eighty six total beneficiaries on appeal (*Id.* at pgs. 1, 5 and 21). In issuing its redetermination decision, NGS still did not provide New Vision with the information it requested regarding the statistical projection.

VII.    POSTPAYMENT RECONSIDERATION APPEAL

37.     On or about May 24, 2010 New Vision timely filed an administrative appeal with Maximus Federal Services ("Maximus"), the Qualified Independent Contractor, appealing NGS' redetermination findings ("Reconsideration Appeal"). (*Id.* at pg. 6) In its Reconsideration Appeal, New Vision challenged not only that the denied services were properly payable by Medicare as they were medically reasonable and necessary, but that the statistical extrapolation was invalid and must be disregarded for numerous errors and that TrustSolutions violated CMS guidelines, generally accepted statistical procedures and Medicare regulations in conducting the audit. (*Id.*) Specifically, New Vision argued that TrustSolutions failed to provide documentation of its statistical sampling methodology to the Provider, conduct an audit consistent with CMS guidelines and generally accepted statistical procedures, and unlawfully used statistical extrapolation (*Id.*)

38.     As of the date New Vision filed its Reconsideration Appeal, it still did not have the information it requested regarding the statistical projection that TrustSolution's relied upon when calculating the $4,155,239.00 overpayment and NGS relied upon when upholding the statistical projection.

39.     While TrustSolutions and NGS refused to disclose this information to New Vision, Maximus, however, reviewed TrustSolutions's determination and consulted statistician Daniel Teitelbaum to review TrustSolutions' statistical methodology and extrapolation, which it had received from NGS and which NGS had received from TrustSolutions. (*Id.* at pg. 22).

40.     On or about July 23, 2010, without the benefit of New Vision's challenge to the statistical sampling and methodology, Maximus issued a "partially favorable" reconsideration decision which again upheld essentially all of NGS' redetermination findings in its entirety. On or about July 30, 2010 Maximus issued a corrected "partially favorable" reconsideration decision, incorrectly claiming that the July 23, 2010 partially favorable reconsideration decision was not dated. The July 30, 2010 reconsideration decision upheld virtually all of NGS' redetermination findings in its entirety, overturning NGS' findings on services provided to four beneficiaries, only. (*Id.* at pgs. 6-7).  Additionally, Maximus declared that the claims were timely reopened, the use of statistical sampling was appropriate due to the "high level of payment error" (despite that ALJ O'Leary later determined that less than 1% of the alleged overpayments were valid) and that the statistical audit was consistent with the Medicare Program Integrity Manual and generally accepted statistical practice. (*Id.*) As of the date the reconsideration decision was issued, TrustSolutions, NGS and Maximus still had not provided New Vision with the information it had requested regarding the statistical projection. (*Id.* at pg. 8).

41.     Upon information and belief, in or about October 2010 NGS began recoupment on

the alleged extrapolated overpayment. At the time NGS initiated recoupment, however, New Vision still had not been provided with the information it had requested regarding the statistical projection. At the time NGS initiated recoupment, therefore, New Vision did not know and could not known whether TrustSolutions accurately identified and calculated the amount of the overpayment and whether NGS had accurately upheld the overpayment determinations and the statistical extrapolation on appeal.

42.     In fact, between March 2, 2010 and August 19, 2010, New Vision had submitted at least eleven FOIA Requests to CMS and its contractors, including TrustSolutions, NGS and Maximus, and had received no information or documents in response. (*Id.* at pg. 9).

43.     On September 3, 2010 Maximus supplied encrypted case file information to New Vision allegedly containing information responsive to New Vision's request for statistical information, however, said CDs were provided with inoperative passwords and importantly, missing the three statistical data files relied upon by the QIC's statistician and Maximus as authority for upholding the statistical extrapolation at reconsideration. (*Id.* at pg. 9).

44.     On or about September 14, 2010 New Vision appealed the QIC's reconsideration decision for an ALJ hearing before an Office of Medicare Hearings and Appeals ("OMHA") ALJ (*Id.* at pg. 9). On or about November 16, 2010 the ALJ issued an order of remand, remanding the case to the QIC for clarification as to its disposition on individual claims. (*Id.* at pg. 10).

45.     It was not until November 24, 2010 that TrustSolutions supplied NewVision with the statistical sampling and extrapolation methodology. (*Id.*)

46.     On or about December 30, 2010 Maximus issued its second partially favorable reconsideration decision which again, upheld NGS' virtually all the redetermination findings in their entirety.

VIII.    POSTPAYMENT ALJ REQUEST AND DECISIONS

47.    New Vision filed its second request for ALJ hearing on February 9, 2011, which appeal was then assigned to ALJ James S. O'Leary (*Id.* at pg. 11).

48.    On or about October 18, 2011 ALJ O'Leary, the first fully independent reviewer of New Vision's appeal, issued a fully favorable determination in favor of New Vision, overturning in their entirety both TrustSolutions's extrapolated overpayment determination of $4,155,239.00 and TrustSolutions's determination of actual overpayments of $672,493.57.

49.    Q2A Administrators, LLC, the Administrative Qualified Independent Contractor subsequently appealed to the Departmental Appeals Board Medicare Administrative Contractor ("DAB"). (*Id.* at pg. 12). On or about February 8, 2012 the DAB remanded the case to the ALJ. (*Id.*)

50.    In a three hundred five page decision dated September 4, 2013, ALJ O'Leary again overturned TrustSolutions's entire statistical sampling and overpayment determination and upheld the denial of only a fraction of TrustSolution's post-payment audit of 228 sampled claims.  He found that TrustSolutions' statistical sampling procedure and methodology were not valid; could not serve as the basis for an accurate extrapolation of the total overpayment; violated CMS directives, policy and standards; and TrustSolutions and NGS violated new Vision's due process rights by wrongfully withholding statistical sampling procedure and methodology information. (*Id.* at pgs. 14, 61, 268, 294-298, 300-305). Of the original actual overpayment determination of $672,493.57, the ALJ upheld the denial of only $35,235.23 in benefit payments (representing less than 1% of the total extrapolated overpayment determination originally and unlawfully assessed against New Vision).

51.    The ALJ excoriated Defendants and found numerous, egregious errors that they

perpetrated resulting in injury to New Vision:

a. There was not sufficient evidence to support that TrustSolutions legally employed the use of statistical sampling in compliance with 42 U.S.C. § 1395ddd(f)(3) which requires a sustained or high level of payment error or that documented education intervention failed to correct the payment error prior utilizing extrapolation (*Id.* at pgs. 268);

b. TrustSolutions and NGS did not comply with the provisions of the Medicare Program Integrity Manual:

    i. TrustSolutions failed to include at least five of the seven required elements in its initial notification of the postpayment review to New Vision (*Id.* at pgs. 269);

    ii. TrustSolutions failed to obtain a statistical expert's approval of the statistical sampling methodology and review of the sampling results prior to releasing the Overpayment Demand Letter (*Id.* at pgs. 271);

    iii. TrustSolutions failed to identify with clarity and consistency the scope of its postpayment audit and the parameters of the universe of the claims at issue (*Id.* at pgs. 271-273);

    iv. TrustSolutions failed to adequately define the sampling unit that served as the basis for the statistical sampling and the claims chosen for the statistical sample (*Id.* at pgs. 273-274);

    v. TrustSolutions improperly included claims in the universe and sample that fell outside the date range TrustSolutions selected for the audit, thus contaminating and disqualifying the sample (*Id.* at pg. 274);

vi. TrustSolutions failed to maintain required written documentation regarding the universe, the sampling unit, the sampling frame, the sample design and the sampling methodology (*Id.* at pgs. 275-277, 279-281); and

vii. TrustSolutions and NGS failed to provide to New Vision with the documentation necessary to allow for replication of the sampling frame and review of the statistical sampling methodology (*Id.* at pgs. 277-279, 296-297);

c. TrustSolutions did not comply with the Medicare Financial Management Manual and generally accepted government auditing standards because (1) TrustSolutions failed to demonstrate that the staff assigned to the audit possessed the necessary qualifications, (2) TrustSolutions failed to demonstrate that its auditors and reviewers were independent, (3) Trust Solutions failed to exercise due professional care in conducting the audit and preparing related reports and quality control and (4) TrustSolutions failed to have an appropriate internal quality control system in place (*Id.* at pgs. 283-290); and

d. TrustSolutions failed to follow generally accepted statistical practice and procedures (*Id.* at pgs. 290-294).

52. Additionally, ALJ O'Leary found that TrustSolutions and NGS violated New Vision's due process rights by failing to provide New Vision with the audit information to which it was entitled. Specifically, ALJ O'Leary said,

- "The overpayment recoupment process herein begins even before the final decision of the Secretary is issued, [which] has the effect of executing upon a

judgment without the necessity of judicial process, and continues after appeals are exhausted." (*Id.* at pg. 298).

- He continued, "When PSC documentation is submitted to adjudicators and neither the PSC nor the adjudicator supplies the same evidence to the appellant, the integrity of the appellate process is undermined and principles of fundamental fairness are violated." (*Id.* at pg. 300).

- Further, he held, "The number of FOIA Requests and the lack of responsiveness of various Medicare entities documented herein paint a picture of beueaucratic delay and obstruction, which is prejudicial to providers with millions of dollars at stake who have to meet fixed deadlines for filing appeals, despite being deprived of an accounting sufficient to show the accuracy of the calculated overpayment amount. …If the party with the burden of proof is refused access to such information by the party that performed the procedure, any adjudication is rendered pointless because the party with all of the information will always prevail over a party deprived of information. The information disparity between the parties not only puts one party at a strategic disadvantage; it also compromises that party's due process rights." (*Id.* at pg. 301).

- In sum, the ALJ determined, "The foregoing redetermination and reconsideration level reviews were not true appeals." (*Id.* at pg. 303).

53.    Q2A Administrators, LLC, the Administrative Qualified Independent Contractor did not appeal the September 4, 2013 decision to the DAB, so the ALJ's decision became the final administrative ruling when the time to appeal expired.  42 U.S.C. § 405(g).

54.    New Vision timely and properly presented its claims and exhausted its

administrative remedies and thus properly initiates this action for relief.

55.     As supported by the facts as found by the ALJ, Defendants acted outside the scope of their official duties and failed to exercise due care as required by a contracted Medicare Integrity Program contractor for CMS under 42 C.F.R. § 421.316 and thus are liable for their unlawful activities.

56.     For example, TrustSolutions did not submit and never produced any sufficient evidence to have made a prima facie case for the actual and extrapolated overpayment demands. Additionally, the sample drawn by TrustSolutions included claims outside the universe of claims for review.  TrustSolutions and NGS failed to adhere to the procedures and methodologies required by CMS manuals and policy.  Defendants' intentional conduct fell outside of their official duties as Medicare contractors and upon information and belief, was motivated by Defendants' desire to secure future, more lucrative CMS contracts.

57.     As a result of Defendants' willful, wrongful, fraudulent and abusive conduct, New Vision was required to prosecute repeated appeals of TrustSolutions' statistical sampling methodology and actual and extrapolated CMS overpayments through the administrative appeals process while Defendants began  withholding the purported overpayment of $4,155,239.00. As a result, and as set forth in greater detail below, New Vision lost essentially all of its business and in prosecuting the appeals, New Vision spent in excess of $400,000.00 in attorneys' and experts' fees and costs that it would not have otherwise incurred but for the willful, wrongful, fraudulent and abusive conduct of Defendants.

58.     New Vision became an enrolled provider with CMS in February of 2002.

59.     During all relevant times herein, nearly all of New Vision's patients were Medicare beneficiaries.

60.     As a result of New Vision's enrolled provider status, New Vision had a robust network of referring providers including both discharge planners in hospitals and individual physician offices. Approximately 60% of its referring providers were discharge planners at the Detroit Medical Center, Beaumont, Henry Ford, Hurley, McLaren and other hospitals and health systems. The remaining approximate 40% of its referring providers were individual physician offices.

61.     All of New Vision's business came through its business relationships with referring providers.

62.     In 2006, during the time of the prepayment review, New Vision had established business relationships with over 150 referring providers.

63.     In or about 2010, during the pendency of the postpayment audit administrative appeals process, New Vision had less than 50 referring providers, having lost business relationships with over 100 referring providers during the course of the postpayment audit administrative appeals process.

64.     In or about 2006, during the time of the prepayment review, New Vision had approximately 150 to 170 active Medicare patients.

65.     As a result of the postpayment audit, in or about December 2010, New Vision had terminated nearly all of its employees as it no longer had the financial ability to maintain payroll, New Vision had lost nearly all of its customers and New Vision had lost the overwhelming majority of its referring providers.

66.     In or about 2011, during the pendency of the postpayment audit administrative appeals process, New Vision had only 7 active Medicare patients.

67.

## CAUSES OF ACTION

### COUNT I
### Abuse of Process

68.    New Vision repeats and re-alleges the allegations of the preceding paragraphs as if fully restated herein.

69.    The Medicare Integrity Program permits PSCs and MACs such as TrustSolutions and NGS to perform Medicare program integrity functions through contract with CMS for the purpose of identifying and recovering overpayments. *See* 42 U.S.C. § 1395ddd.

70.    However, Congress placed certain limitations and requirements on Medicare contractors in their performance of program integrity functions. Specifically, Title XVIII §1893(f)(7) of the Social Security Act ("Act") requires Medicare contractors to provide supplier or provider audited through a postpayment audit with written notice of the contractor's intent to conduct an audit and to present a full review and explanation of the findings of the audit upon its completion  42 U.S.C. § 1395ddd.

71.    Further, § 1893(f)(3) of the Act prohibits use of extrapolation to determine overpayment amounts unless the Secretary determines that "(A) there is a sustained or high level of payment error; or (B) documented educational intervention has failed to correct the payment error." *Id.*

72.    § 1871 of the Act provides that the Secretary "shall prescribe such regulations as may be necessary to carry out the administration of the insurance programs under [Title XVIII." 42 U.S.C. § 1395hh. 42 C.F.R. §§ 421.300 through 421.316 provide Medicare regulations pertaining to Medicare integrity program contractors, such as TrustSolutions and NGS.

73.    42 C.F.R. § 421.304 lists Medicare integrity program contractor functions,

including "[d]etermining whether a payment is authorized under title XVIII, as specified in section 1862(b) of the Act, and recovering mistaken and conditional payments under section 1862(b) of the Act."

74.     CMS has promulgated standards for contractors performing Medicare audits. Specifically, CMS' Medicare Financial Management Manual ("MFMM")(Internet-only Manual Pub. 100-6) requires Medicare audits to comply with Government Auditing Standards. MFMM, Chpt. 8, § 80. CMS' Medicare Program Integrity Manual ("MPIM")(Internet-only Manual Pub. 100-8) provides mandatory directives Medicare contractors must follow when conducting post-payment audits and statistical sampling and extrapolation. MPIM, Chpt. 3.

75.     As set forth above and as described in detail in ALJ O'Leary's September 4, 2013 ALJ Decision, Defendants knowingly violated §§1893(f) (3) and (7) of the Social Security Act and failed to comply with CMS guidelines in initiating and conducting the postpayment audit and statistical extrapolation of New Vision's billed services.

76.     Defendants intentionally and improperly used the valid legal process of CMS's postpayment audit review process and administrative appeal proceedings to obtain unlawful overpayment findings against New Vision.

77.     There was not a sustained or high level of payment error, nor evidence that documented educational intervention failed to correct the payment error and accordingly, the alleged primary purpose of the extrapolated postpayment audit was not justified.

78.      In fact, upon information and belief, Defendants intentionally and willfully disregarded CMS directives and protocols related to provider due process and postpayment audit review processes to ensure that Anthem, TrustSolutions, NGS and other Anthem subsidiaries

would win future CMS contracts, including future RAC, MAC and ZPIC contracts, through which RACs contractors are entitled to contingent compensation on their overpayment determinations.

79.     Defendants' intentional and willful disregard of CMS directives and protocols set forth in greater detail above, were both an irregular use of and a perversion of the CMS postpayment audit review process and upon information and belief, were committed in furtherance of their ulterior purpose of winning future CMS contracts.

80.     As a result of Defendants' abusive and wrongful use of the Medicare postpayment audit review process, New Vision lost essentially of its business, suffered in excess of $20,000,000.00 in lost business profits and incurred over $400,000.00 in legal and expert fees challenging the wrongful postpayment audit findings.

## COUNT II
## Tortious Interference with Business Relationships and Expectancies

81.     New Vision repeats and re-alleges the allegations of the preceding paragraphs as if fully restated herein.

82.     During all relevant times herein, New Vision was an enrolled provider with CMS for home health services.

83.     New Vision became an enrolled provider with CMS in February of 2002.

84.     During all relevant times herein, nearly all of New Vision's patients were Medicare beneficiaries.

85.     As a result of New Vision's enrolled provider status, New Vision had a robust network of referring providers including both discharge planners in hospitals and individual physician offices. Approximately 60% of its referring providers were discharge planners at the Detroit Medical Center, Beaumont, Henry Ford, Hurley, McLaren and other hospitals and health

systems. The remaining approximate 40% of its referring providers were individual physician offices.

86.     All of New Vision's business came through its business relationships with referring providers.

87.     In 2006, during the time of the prepayment review, New Vision had established business relationships with over 150 referring providers.

88.     In or about 2010, during the pendency of the postpayment audit administrative appeals process, New Vision had less than 50 referring providers, having lost business relationships with over 100 referring providers during the course of the postpayment audit administrative appeals process.

89.     In or about 2006, during the time of the prepayment review, New Vision had approximately 150 to 170 active Medicare patients.

90.     As a result of the postpayment audit, in or about December 2010, New Vision had terminated nearly all of its employees as it no longer had the financial ability to maintain payroll, New Vision had lost nearly all of its customers and New Vision had lost the overwhelming majority of its referring providers.

91.     In or about 2011, during the pendency of the postpayment audit administrative appeals process, New Vision had only 7 active Medicare patients.

92.     By virtue of TrustSolution's and NGS' roles as Medicare Integrity Program contractors, Defendants were aware that New Vision had a relationship and continued business expectancy with CMS as an enrolled provider of Medicare services.  Additionally, by virtue of TrustSolution's and NGS' roles as MIP contractors, Defendants were aware of New Vision's relationship and continued business expectancy with its Medicare patients and extensive network

of referring providers.

93.     Despite their knowledge of these relationships and business expectancies, Defendants knowingly, intentionally and improperly interfered with these relationships and business expectancies, inducing and causing a disruption and termination in these relationships and business expectancies.

94.     Defendants were certain or substantially certain that asserting an actual overpayment of $672,493.57 and an extrapolated overpayment of $4,155,239.00 and upholding virtually all of said findings on appeal at redetermination against New Vision would interfere with New Vision's business relationships and expectancies with CMS, referring providers and Medicare patients.

95.     Defendants intentionally committed per se wrongful acts in initiating the postpayment audit and statistically extrapolating the audit findings given the nearly fully favorable prepayment review results in favor of New Vision and that there was not a sustained or high level of payment error or showing that documented educational intervention failed to correct the payment error, in violation of § 1893(f)(3) of the Act.

96.     Defendants intentionally committed per se wrongful acts in failing to comply with the Medicare Program Integrity Manual, Medicare Financial Management Manual and generally accepted government auditing standards, and generally accepted statistical practice and procedures as set forth in greater detail above and in ALJ O'Leary's ALJ Decision attached here as **Exhibit A.**

97.     Alternatively, Defendants intentionally and maliciously initiated the postpayment audit and statistically extrapolated the audit findings and upheld said findings on appeal which were not legally justified for the purpose of invading New Vision's business relationships and

expectancies with CMS, referring providers and Medicare beneficiaries.

98. Defendants' postpayment audit, statistical extrapolation and review on appeal were not lawful nor committed with justification or excuse as they were undertaken in violation of the Social Security Act, federal regulations and controlling CMS guidelines, as stated above.

99. Defendants' postpayment audit, statistical extrapolation and review on appeal were undertaken with the purpose of unlawfully interfering in New Vision's business relationships and expectancies with CMS, referring providers and Medicare beneficiaries and upon information and belief, with the self-serving, improper, unethical and fraudulent purpose of securing future CMS contracts, including as future RACs, MACs and ZPICs.

100. Defendants' intentional and improper interference proximately caused New Vision's damages.

101. As a result of Defendants' intentional and improper interference, New Vision lost essentially all of its business, lost nearly all of its business relationships and expectancies with referring providers, CMS and Medicare patients, terminated the majority of its employees and suffered in excess of $20,000,000.00 in past and future lost business profits.

<u>**COUNT III**</u>
<u>**Malicious Prosecution of Civil Proceedings**</u>

102. New Vision repeats and re-alleges the allegations of the preceding paragraphs as if fully restated herein.

103. Defendants' initiation of the postpayment audit, statistical extrapolation of the audit findings and findings on appeal were without probable cause given the nearly fully favorable findings to New Vision on the prepayment review and as there was not a sustained or high level of payment error or evidence that documented educational intervention failed to correct the payment error.

104. Defendants' malicious initiation of the postpayment audit, statistical extrapolation of the audit findings and findings on appeal were not primarily for the purpose of securing proper adjudication of the claims, but rather, upon information and belief, were primarily undertaken for the purpose of securing future CMS contracts, including as future RACs, MACs and ZPICs.

105. In his September 2003 ALJ Decision, ALJ O'Leary overturned TrustSolutions' entire statistical sampling and overpayment determination and upheld the denial of only a fraction of TrustSolutions' post-payment audit. Of the original actual overpayment determination of $672,493.57, the ALJ upheld the denial of only $35,235.23 in benefit payments (representing less than 1% of the total extrapolated overpayment determination originally and unlawfully assessed against New Vision) such that the postpayment audit terminated in favor of New Vision.

106. As a direct result of the postpayment audit, statistically extrapolated audit findings, and wrongful findings on appeal and the malicious manner in which Defendants prosecuted the postpayment audit, New Vision suffered special injuries, including interference with New Vision's reputation, loss of business relationships and expectancies with CMS, referring providers and patients; deprivation of its due process rights and essentially forcing New Vision out of business, resulting in more than $20,000,000.00 in past and future lost business profits.

## COUNT IV
## Civil Conspiracy to Abuse Process

107. New Vision repeats and re-alleges the allegations of the preceding paragraphs as if fully restated herein.

108. Defendants acted unlawfully by abusing the valid legal process of CMS's postpayment audit review process and administrative appeal proceedings as set forth in greater detail above, to obtain unlawful overpayment findings against New Vision with the purpose of

ensuring that Anthem, TrustSolutions, NGS and other Anthem subsidiaries would win future CMS contracts, including future RAC, MAC and ZPIC contracts.

109.    Upon information and belief, Defendants knew of and acquiesced in TrustSolution's abuse of process and upon information and belief, furthered the abuse of process by requesting, encouraging and ratifying TrustSolution's unlawful and wrongful initiation and prosecution of the postpayment audit and statistical extrapolation of New Vision's billed services.

110.    Defendants jointly intended to win future CMS contracts by unlawfully abusing the valid legal process of CMS's postpayment audit review process and administrative appeal proceedings.

111.    As a result of Defendants' conspiracy to abuse process, New Vision lost essentially of its business, suffered in excess of $20,000,000.00 in lost business profits and incurred over $400,000.00 in legal and expert fees challenging the wrongful postpayment audit findings.

### COUNT V
### Civil Conspiracy to Tortiously Interfere with Business Relationships and Expectancies

112.    New Vision repeats and re-alleges the allegations of the preceding paragraphs as if fully restated herein.

113.    Defendants acted unlawfully by tortiously interfering with New Vision's business relationships and expectancies with CMS, referring providers and patients by initiating the postpayment audit, statistically extrapolating the audit findings, wrongfully upholding said findings on redetermination appeal and failing to comply with the Medicare Program Integrity Manual, Medicare Financial Management Manual and generally accepted government auditing standards, and generally accepted statistical practice and procedures as set forth in greater detail

above with the with the self-serving, improper, unethical and fraudulent purpose of securing future CMS contracts.

114.    Upon information and belief, Defendants knew of and acquiesced in TrustSolution's tortious interference with New Vision's business relationships and expectancies and upon information and belief, furthered said wrongful conduct by requesting, encouraging and ratifying TrustSolution's unlawful and wrongful initiation and prosecution of the postpayment audit, statistical extrapolation of New Vision's billed services, disregard of the Medicare Program Integrity Manual, Medicare Financial Management Manual, generally accepted government auditing standards, and generally accepted statistical practice and procedures.

115.    Defendants jointly intended to win future CMS contracts by intentionally and improperly interfere with New Vision's business relationships and expectancies.

116.    As a result of Defendants' conspiracy to intentionally and improperly interfere with New Vision's business relationships and expectancies, New Vision lost essentially all of its business, lost nearly all of its business relationships and expectancies with referring providers, CMS and Medicare patients, terminated the majority of its employees and suffered in excess of $20,000,000.00 in past and future lost business profits.

## COUNT VI
## Civil Conspiracy to Maliciously Prosecute Civil Proceedings

117.    New Vision repeats and re-alleges the allegations of the preceding paragraphs as if fully restated herein.

118.    Defendants acted unlawfully by maliciously initiating the postpayment audit and statistical extrapolation of the audit findings and upholding said findings on appeal without probable cause, as set forth in greater detail above, and not for the primary purpose of securing

proper adjudication of the claims, but rather, upon information and belief, primarily for the purpose of securing future CMS contracts.

119. Upon information and belief, Defendants knew of and acquiesced in TrustSolution's malicious initiation of the postpayment audit and statistical extrapolation of the audit findings and furthered said wrongful conduct by requesting, encouraging and ratifying TrustSolution's wrongful conduct.

120. Defendants jointly intended to win future CMS contracts by maliciously prosecuting the postpayment audit.

121. As a result of Defendants' conspiracy to maliciously prosecute the postpayment audit, New Vision suffered damages, including interference with New Vision's reputation, loss of business relationships and expectancies with CMS, referring providers and patients; deprivation of its due process rights and essentially forcing New Vision out of business, resulting in more than $20,000,000.00 in past and future lost business profits.

## COUNT VII
## Concert of Action

122. New Vision repeats and re-alleges the allegations of the preceding paragraphs as if fully restated herein.

123. As set forth in greater detail above, Defendants acted in concert and were jointly engaged in tortious activities including abuse of process, tortious interference with New Vision's business relationships and expectancies and malicious prosecution of the postpayment audit, as set forth in greater detail above.

124. Defendants acted in concert in withholding statistical information from New Vision upon which New Vision could review and challenge the statistical extrapolated findings and methodology.

125.    As a result of Defendant's tortious activities, New Vision lost essentially all of its business, lost nearly all of its business relationships and expectancies with referring providers, CMS and Medicare patients, lost its reputation, was deprived its due process rights, lost more than $20,000,000.00 in past and future business profits and incurred over $400,000.00 in legal and expert fees challenging the wrongful postpayment audit findings.

**COUNT VIII**
**Violation of New Vision's Fifth Amendment Right to Procedural Due Process**

126.    New Vision repeats and re-alleges the allegations of the preceding paragraphs as if fully restated herein.

127.    New Vision had a protected property interest in reimbursement from Medicare for its home health services at the duly promulgated reimbursement rate.

128.    A constant and consistent pattern of ALJ decisions consistently overturning TrustSolutions' and NGS' prior findings, which occurred through the administrative appeals of the prepayment review findings, created New Vision's legitimate expectation of and a protected property interest in Medicare reimbursement at the Medicare-approved reimbursement rate.

129.    To satisfy the requirements of due process, among other obligations set forth in greater detail above, TrustSolutions was required to provide New Vision with the reasons for the postpayment review, notice that the audit would involve statistical sampling, identification of the universe of claims subject to the postpayment audit, involve a qualified statistical expert prior to issuance of the overpayment notice to the provider, maintain and provide to New Vision the information necessary to allow New Vision to review and replicate the statistical sampling and extrapolation. Additionally, to satisfy the requirements of due process, TrustSolutions was required to provide New Vision with a meaningful opportunity to review and respond to the adverse determinations and extrapolated overpayment findings asserted against it.

130.    To satisfy the requirements of due process, among other obligations set forth in greater detail above, NGS was required to provide to New Vision the information necessary to allow New Vision to review and replicate the statistical sampling and extrapolation and provide New Vision with a meaningful opportunity to review and respond to the adverse determinations and extrapolated overpayment findings asserted against it.

131.    The most basic due process protections require that an aggrieved party such as New Vision have access to the evidence used to support a decision adverse to it. By CMS policy, a PSC such as TrustSolutions is required to maintain complete documentation of the sampling methodology is followed to allow for recreation should the methodology be challenged. MPIM, Chapter 3, § 3.10. By regulation, a contractor that issues a redetermination decision, such as NGS, must include "as appropriate, a summary of the clinical or scientific evidence used in making the redetermination." 42 CFR 405.956(b)(2).

132.    As summarized by ALJ O'Leary, "The lack of timely responses from [TrustSolutions and NGS] guaranteed the impossibility of presenting a meaningful challenge to the validity of the statistical sampling herein by the Appellant and its statistical experts prior to reconsideration", which denied New Vision its right to a "true appeal." (*Id.* at pgs. 14 and 303).

133.    TrustSolution's and NGS' willful disregard of their legal obligations to fully provide New Vision with the evidence used in support of the redetermination and reconsideration decisions and extrapolated overpayment findings deprived New Vision of its ability to meaningfully challenge the validity of the statistical sampling and extrapolation and thus, deprived New Vision of a fair and impartial review at redetermination and reconsideration.

134.    Once the reconsideration decision was rendered in late July 2010, NGS began recouping on the alleged overpayment per 42 USC 1395ddd(f)(2). NGS' recoupment on the

statistically extrapolated overpayment without first providing New Vision with a meaningful opportunity to challenge the validity of the statistical sampling and alleged overpayment deprived New Vision of both its property interests and liberty interests in and associated with its Medicare payments and home health business without due process of law, in violation of the Fifth Amendment of the United States Constitution and other applicable laws.

135.    TrustSolutions and NGS had no legitimate interest in wrongfully withholding and ignoring New Vision's requests for the statistical information until the time period had passed for NGS to begin recoupment on the alleged, unfounded statistically extrapolated overpayment.

### COUNT IX
### Violation of New Vision's Fifth Amendment Right of Substantive Due Process

136.    New Vision repeats and re-alleges the allegations of the preceding paragraphs as if fully restated herein.

137.    As asserted above, New Vision had a protected property interest in reimbursement from Medicare for its home health services at the duly promulgated reimbursement rate.

138.    A constant and consistent pattern of ALJ decisions consistently overturning TrustSolutions' and NGS' prior findings, which occurred through the administrative appeals of the prepayment review findings, created New Vision's legitimate expectation of and a protected property interest in Medicare reimbursement at the Medicare-approved reimbursement rate.

139.    It was a clear abuse of discretion and arbitrary and capricious action for NGS to withhold New Vision's Medicare payments through recoupment of the alleged extrapolated overpayment without first providing New Vision an opportunity to review and challenge the statistical extrapolation.

140.    Allowing NGS to recoup on the alleged extrapolated overpayment through withholding New Vision's future Medicare payments where NGS wrongfully, unlawfully and

knowingly failed to provide New Vision with an opportunity to review and challenge the statistical extrapolation with the illegitimate purpose of securing future Medicare contracts failed to advance a legitimate government interest.

141.    Alternatively, allowing NGS to recoup on the alleged extrapolated overpayment through withholding New Vision's future Medicare payments where NGS wrongfully, unlawfully and knowingly failed to provide New Vision with an opportunity to review and challenge the statistical extrapolation was an unreasonable means toward advancing the legitimate government interest of identifying overpayments and protecting the Medicare trust fund.

142.    Defendants abused their discretion and acted arbitrarily and capriciously by utilizing standards of review not authorized by CMS.

143.    It was a clear abuse of discretion and arbitrary and capricious action for TrustSolutions and NGS to deny virtually all of the claims under the Medicare administrative appeals process and wrongfully statistically extrapolate the findings and uphold said findings on appeal given the nearly 100% favorable findings to New Vision through the prepayment review and the lack of evidence in support of a sustained or high level of payment error or that documented education intervention failed to correct the payment error prior utilizing extrapolation.

144.    TrustSolutions and NGS' arbitrary and capricious audit findings and decision to commence recoupment of the alleged overpayments forced New Vision out of business and deprived New Vision of both its property interests and liberty interests in and associated with its Medicare payments and home health business without due process of law, in violation of the Fifth Amendment of the United States Constitution and other applicable laws.

## JURY DEMAND

145.    Plaintiffs demand a jury trial.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully requests that this Court grant the following relief against Defendants for the damages New Vision so wrongfully incurred:

A.  To the extent necessary to effectuate justice and afford the relief requested, an order from the Court finding that Anthem unlawfully used TrustSolutions as a mere instrumentality and as its alter ego and piercing Anthem's corporate veil;

B.  Actual damages in an amount no less than 20 million dollars, to be proved at trial before a jury;

C.  Pre-judgment and post-judgment interest as allowed by law;

D.  Attorneys fees and costs as allowed by law; and

E.  All other relief to which Plaintiffs are entitled at law or equity.


Respectfully submitted,



By:/s/ Andrew B. Wachler
Andrew B. Wachler (P29293)
Michael D. Bossenbroek (P69008)
Attorneys for Plaintiffs
210 E. Third Street; Suite 204
Royal Oak, MI 48067
Phone:  (248) 544-0888
awachler@wachler.com
mbossenbroek@wachler.com


Dated:  September 1, 2016